**In the Matter of LEHIGH VALLEY RAILROAD, Debtor.**

**In re APPLICATION FOR LOAN UNDER EMERGENCY RAIL FACILITIES RESTORATION ACT.**

**No. 70–342.**

United States District Court,
E. D. Pennsylvania.

May 21, 1973.

Williamson P. Donald, Duane, Morris & Heckscher, Philadelphia, Pa., for Trustees.

Eugene Anderson, Jr., William Leiper, James E. Howard and Ivan Shomer, Philadelphia, Pa., for Trustees, Penn Central Trans. Co.

Andrew P. Goldstein, Washington, D. C., for Blue Coal Corp., Consolidated Trans. Services and Delaware Otsego Corp.

William Quinn, for Delaware & Hudson Railway Co.

T. P. Shearer, Pittsburgh, Pa., for United Transp. Union.

James Dausch, Dept. of Justice, for United States.

Glen Gilman, for PUC, Com. of Pa.

## MEMORANDUM AND ORDER
## NO. 183

FULLAM, District Judge.

In June 1972, the rail facilities of the Debtor suffered extensive damage as a result of tropical storm Agnes. On October 27, 1972, Congress enacted the "Emergency Rail Facilities Restoration Act," authorizing federal loans at low interest rates "for the purpose of restoring or replacing railroad facilities, equipment, or services which are determined to be essential to public service . . . damaged or destroyed as a result of the natural disasters which occurred during the month of June 1972."

The Trustees have filed a petition (Document No. 575) seeking authorization to file an application for a loan pursuant to this statute. The Trustees propose to borrow not more than $4,254,-990, at an interest rate not to exceed 6

percent per annum, and with no payments of principal required for 10 years. A hearing on this petition has been held, on April 30, 1973, and the views expressed by various interested parties have been carefully considered. It is apparent that there are so many variables in the situation that it is difficult to come to grips with the merits of the Trustees' proposal.

By way of background, it should be mentioned that the Act provides, in § 4 (b) "no loan application shall be approved under this Act after eight months have elapsed from its date of enactment." (*I. e.*, the deadline is June 27, 1973.) To date, the funds necessary to carry out the loan program established by the Act have not yet been appropriated; however, it is apparently contemplated that the funds will be made available.

There are two principal areas of uncertainty which make it difficult for the parties to decide what position to take, and for the Court to evaluate the varying contentions of the parties. These are, (1) the relative priority to be assigned to the debt which would be created, and (2) the precise uses to which the loan proceeds will be devoted. Under the statute, the Secretary of Transportation is given a rather wide range of discretion to impose conditions in both areas. Thus, he may require that certain facilities deemed essential be restored, even though the railroad might prefer to pursue abandonment proceedings. And the Secretary, while generally required to "obtain such security as [he] deems will adequately protect the interests of the United States" may agree to subordinate the government's claim to those of other creditors "so long as such position is not lower than that of a pre-bankruptcy unsecured creditor of the railroad."

Generally speaking creditors of the Debtor would have standing, and motivation, to object to the creation of additional debt, only if the new debt would rank above or equal to their own existing claims. Therefore, until the precise terms of the proposed loan have been determined by the Secretary of Transportation and the Trustees, the arguments of the other parties to these proceedings are hypothetical at best. And until the precise projects to be funded or reimbursed by the proceeds of the loan are known, it is difficult to express firm conclusions as to the appropriate priority of the resulting obligations.

In considering what kind of obligation the Trustees should be permitted to incur, it is necessary to know whether the expenditure of the loan proceeds will result in enhancement of the liquidation value of the Debtor's estate; whether it will preserve profitable, marginal, or deficit operations over the particular line or branch; and whether the rail services preserved by the loan proceeds are essential in the public interest, or merely desirable. And it would also, of course, be helpful to have as much information as possible bearing upon the likelihood of the Debtor's survival as a railroad.

The Trustees, thoroughly familiar with the relative rights of existing creditors, and with the financial condition of the Debtor, and obviously conscious of the implications of their recent petition for leave to terminate rail operations unless substantial financial assistance is forthcoming, have concluded that they should not consummate the loan here in question unless the resulting obligation would rank no higher than on a par with pre-bankruptcy unsecured claims. In the time frame with which we are now dealing, I agree. While no hard-and-fast conclusions are possible, in view of the uncertainties mentioned above, and the pendency of various legislative proposals for dealing with the problems of railroads in the Northeast, it seems highly unlikely that the Trustees could make the requisite showing to justify the creation of additional priority debt obligations under the circumstances.

The Trustees also seek approval of a limitation on the interest rate to be charged in connection with the proposed loan, and upon the terms of the loan. I believe it is unnecessary, and perhaps undesirable, to attempt such determinations at this time. Since further approval by the Court will be required before the Trustees consummate the transaction by draw-downs, it seems preferable to defer until that time review of the detailed provisions which emerge from the negotiations.

### ORDER NO. 183

And now, this 21st day of May, 1973, it is ordered:

1. The Trustees are authorized to file an application with the Administrator, Federal Railroad Administration, for loans pursuant to the Emergency Rail Facilities Restoration Act (P.L. 92–591) in the principal amount of $4,254,990.

2. The terms of the Trustees' application shall include the granting of legal priority to the United States, with respect to the payment of the principal and interest of such loans, subordinate to the interests of all creditors of the Debtor except pre-bankruptcy general unsecured creditors.

3. Before the actual completion of any such loans, the Trustees shall file a copy of such approved loan program with this Court and give notice of such filing to the Trustees of the Penn Central Transportation Company and to the trustees under the indentures of all mortgages constituting liens on real property of the Debtor who shall have 14 days from the date of such notice to file objections in these proceedings to the Trustees' completion of any such loans, and to request a hearing on such objections, if desired. If objections are filed, the Trustees shall not consummate the transaction until further Order of this Court.